FILED
2021 MAR 30 AM 11:08
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ROBERT SMETHURST,<br><br>        Plaintiff,<br><br>v.<br><br>SALT LAKE CITY CORPORATION,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00085-JNP<br><br>District Judge Jill N. Parrish |

## INTRODUCTION

Before the court are a Motion for Partial Summary Judgment (ECF No. 40) filed by Plaintiff Robert Smethurst ("Smethurst") and a Motion for Summary Judgment (ECF No. 54) filed by Defendant Salt Lake City Corporation ("the City"). In his Amended Complaint (ECF No. 22), Smethurst asserts five causes of action against the City. The court previously dismissed Smethurst's first cause of action. *See* ECF No. 31. Smethurst moves for summary judgment only on his fourth cause of action. The City moves for summary judgment on all remaining causes of action. For the reasons set forth herein, the court DENIES Plaintiff's Motion and DENIES IN PART and GRANTS IN PART Defendant's Motion.

## BACKGROUND

This case centers on the City's termination of Smethurst's employment in April 2017. Smethurst began his employment with the City in May 1995. He eventually attained the position of Irrigation Operator II and held it until his termination. Smethurst reported to Dave Maiorano

("Maiorano"), the City's Irrigation Supervisor, who in turn reported to Kelly Brown ("Brown"), the City's Storm Water Maintenance Manager.

In late 2016, Smethurst was suffering from mental health issues including depression, which he attributes to the death of his wife several years earlier and the deaths of both of his parents between August and December 2016. In January 2017, Smethurst's medical provider, Travis Schilling ("Schilling"), filled out a "Certification of Health Care Provider for Employee's Serious Health Condition" ("Certification"). In it, Schilling wrote that due to Smethurst's mental health issues, Smethurst would be unable to perform any of his job functions and needed "full time off for mental health." ECF 40-7 at 2. Schilling explained that Smethurst suffered from "major depression, anxiety, prolonged grief [and] bereavement, social isolation, insomnia, [and] alcohol consumption." *Id.* He indicated that Smethurst required "weekly therapy and follow up" and that he needed "100% [of the time off] allowed by FMLA/ disability." *Id.* at 3.

Darlene Harper ("Harper"), a Senior Human Resource Consultant for the City, reviewed the Certification. Michael Morris ("Morris"), a Human Resource Consultant for the City assigned to Public Utilities, also received a copy of the Certification. The City approved Smethurst for twelve weeks of FMLA leave beginning January 26, 2017 and ending April 16, 2017.[1] Brown and Maiorano were informed of Smethurst's leave. In addition to approving Smethurst's FMLA leave, the City provided Smethurst with short-term disability benefits beginning January 28, 2017 and extending until April 16, 2017.

---

[1] The City contends that the FMLA leave began on January 26, not January 23, but both parties agree that it ended on April 16.

On April 10, 2017, approximately one week before his FMLA leave was set to conclude, Smethurst called Harper and requested additional time off. Smethurst testifies that he informed Harper he was requesting the time off so he could finish his "therapy class." Harper denies recollection of the substance of the call, and the City disputes that Smethurst mentioned anything about mental health or therapy classes. Harper told Smethurst that if he wanted additional time off, he could look into long-term disability benefits or request to use his personal leave, but she did not discuss with him the possibility of an accommodation under the ADA. Harper emailed Morris shortly after the call and informed him that she had told Smethurst he "could check into LTD if he has that benefit." ECF No. 40-16 at 1.

Shortly after Morris learned of the call, he drafted a "Notice of Intent to Separate" and sent it to Brown. Brown approved the Notice and sent it to Smethurst on April 12, 2017. The Notice stated:

> The purpose of this letter is to inform you that effective 04/14/2017, you will have exhausted all approved FMLA leave time. Based on your medical needs and/or the information you provided to the City, I understand you will not be able to return to work at this time.
>
> Pursuant to Salt Lake City policy 3.03.05 and applicable MOU, employees may not be absent from the workplace unless the  leave is protected under FMLA or is an approved leave of absence. Unprotected or unapproved absences may be addressed by City managers.
>
> Although your protected leave under the FMLA has been or will be exhausted, you may still qualify for a leave of absence. A department-approved leave of absence will allow you to continue your City benefits for a limited period of time. Even if you are granted a department-approved leave of absence, you may be separated from your position in our department without a right to return to work at the end of the leave. If you wish to apply for a department-approved leave of absence, please submit your written request to the Department Director of Public Utilities by April 22, 2017.

3

Since your inability to return to work is involuntary for medical reasons, this memorandum is notice of a proposed action which may affect your employment and gives you an opportunity to present alternatives. You may propose reasonable alternatives in writing that would allow you to return to work Or, if you prefer, I would be glad to meet with you to discuss your circumstances, hear any potential proposals you may have, and answer any questions. If you would like to avail yourself of either of these opportunities to be heard, you may contact me at [phone number] to schedule a meeting or submit your written statement within ten (10) days of the date of this memorandum.

If you do not provide us with a response or alternative by the stated deadline, I intend to separate you from your employment with the City by no later than close of business on April 24, 2017.

If you believe that you may qualify for accommodation under the Americans with Disabilities Act (ADA), you are encouraged to contact Melissa Green, HR Program Manager, at [phone number] concerning your rights and obligations. To pursue this option, you must contact Melissa within five (5) days of the date of this letter.

Please contact me at [phone number] if you would like to discuss this matter in further detail. If you have any questions, you may also wish to contact Michael Morris, Human Resources Consultant at [phone number].

On the same day he received the Notice, April 12, 2017, Smethurst spoke on the phone with Maiorano. Smethurst asserts that he told Maiorano he needed more time off in order to complete his therapy class, but the City disputes this assertion. Maiorano testified that Smethurst only asked for further time off, without specifying why. *See* Maiorano Dep. (ECF 40-2) at 71:7–72:8.[2] Maiorano informed Smethurst that he lacked paid time off that he could use to extend his leave, but Smethurst asserts that he in fact had hundreds of hours of paid time off. At some point

---

[2] Maiorano admits that Smethurst likely did not go into the details of his request for time off because Maiorano was "so adamant" that Smethurst needed to return to work immediately. Maiorano Dep. (ECF No. 40-2) 70:4–13.

after his conversation with Smethurst, Maiorano spoke with Brown and Morris and informed them of the substance of the call.

Smethurst called Brown a few days later, again requesting more time off. Brown did not ask why Smethurst was requesting the time off, but he told him he could not use his personal leave days. Brown instructed Smethurst to contact Morris if he needed further information. Brown also informed Morris via email that Smethurst had once again asked for more time off. Smethurst called and spoke to both Morris and Harper on April 19, 2017.  He asserts that he told Morris he needed time off to finish his therapy class and that he asked Harper about long-term disability benefits. Harper and Morris deny recollection of the full substance of the calls, although Harper acknowledged via an email to Morris that Smethurst had inquired about long-term disability benefits.

On April 20, 2017, Smethurst attempted to send an email to Laura Briefer ("Briefer"), the head of the Public Utilities Department. In the email, he stated, "Right now I'm in a group treatment trying to deal with my life and I'm asking if I can have three more weeks to finish this treatment? I like [sic] to come back by 5-15-2017." ECF No. 40-24. In the address line, however, Smethurst inadvertently left one letter out of Briefer's email address (he failed to include the "v" in @slc.gov). Briefer never received the email, but Smethurst was under the impression that she had, since it was not returned as undeliverable. *See* ECF No. 40-28 at 1.

Smethurst spoke with Morris again on April 21, 2017. During this conversation, Morris informed Smethurst that he had spoken with Briefer and that they wanted to know the exact date he would be back at work. They also wanted to know whether he had his commercial driver's

license ("CDL").[3] Smethurst informed Morris that he could return to work May 15, 2017, and that

he would have his CDL by then. Smethurst testifies that he told Morris the May 15th date would

give him enough time to finish his therapy classes, but Morris does not remember Smethurst

having mentioned anything about the classes. Morris admits that he never raised the topic of an

ADA accommodation with Smethurst during any of their calls.

Increasingly worried that he was going to lose his job if he did not return to work, Smethurst

contacted his therapist soon after his April 21 phone call with Morris. While his therapist urged

him to finish his therapy class, he agreed to sign a work release that would allow Smethurst to

return to his duties. On April 24, 2017, Smethurst again called Morris and told him that he could

return to work as soon as needed. He also told him he could have his CDL by May 10th. Smethurst

contends that Morris never relayed this information to Maiorano or Brown. Morris did not recall

whether he told them about Smethurst's availability, saying only that it "seem[ed] like something

[he] would [have] do[ne]." Morris Dep. (ECF No. 40-5) 175: 1–22. Brown, however, testified that

he never learned that Smethurst could return to work. Brown Dep. (ECF No. 40-3) 114:3–6.

---

[3] Smethurst was cited for driving under the influence (DUI) in April 2016. As a result of the DUI citation, Smethurst's driver's license and CDL were suspended. The City terminated him as a result but reinstated him upon appeal. In the reinstatement letter, dated July 29, 2016, Briefer wrote that Smethurst would "be required to obtain a valid CDL within six months from the date of reinstatement, which would be February 1, 201[7]." ECF No. 54-3 at 1. She further informed him that "[f]ailure to meet this requirement, or any other minimum qualification for the Irrigation Operator II position, may result in further disciplinary action, up to and including termination of employment." *Id.*

Smethurst waited to hear back from someone at the City, knowing that he was set to be terminated on April 28, 2017.[4]  Not having heard from Morris or his (Smethurst's) supervisors, he attempted to call Morris twice on April 26, 2017. Morris did not answer, nor did he attempt to return the calls. Rather, on the morning of April 28, 2017, Morris emailed Brown a draft Notice of Termination. Brown did not attempt to communicate with Smethurst about it, but rather signed it and returned it to Morris. Morris emailed it to Smethurst that morning. Smethurst attempted to call Morris twice more that afternoon, but Morris did not answer or return the calls.

After he was terminated, Smethurst reached out to Briefer in an attempt to appeal his decision. There is no indication that Briefer responded to him. The City did not fill Smethurst's position for over a year, and the person it eventually hired did not have a CDL.

Smethurst asserts five causes of action against the City: (1) deprivation of property interest without due process under 42 U.S.C. § 1983; (2) violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2614(a); (3) breach of implied contract; (4) failure to offer a reasonable accommodation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(b)(5)(A); and (5) termination in violation of the ADA, 42 U.S.C. § 12112(a). The court previously dismissed Plaintiff's first cause of action. *See* ECF No. 31. Smethurst moves for summary judgment only on his Fourth Cause of Action. The City moves for summary judgment on all of Smethurst's remaining claims. The court addresses each claim below.

---

[4] While the Notice of Intent to Separate stated that Smethurst would be terminated on April 24, 2017, Morris at some point informed Smethurst that the date would be April 28, 2017. The City does not dispute this.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (citation omitted). "At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter." *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). Instead, the court must "view all evidence and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (citation and alteration omitted).

## DISCUSSION

Due to the order of the issues presented in the parties' briefing, the court first addresses Smethurst's Fourth and Fifth Causes of Action, then moves to his Second and Third Causes of Action.

## I.     Reasonable Accommodation under the ADA (Fourth Cause of Action)

Smethurst and the City both move for summary judgment on Smethurst's fourth cause of action, failure to offer a reasonable accommodation in violation of the ADA. Smethurst alleges

8

that the City failed to engage in the interactive process. He argues that the City, knowing that Smethurst was an individual with a disability, had a responsibility to respond and engage in good faith when he asked for additional leave at the conclusion of his FMLA leave. Smethurst contends that the City shirked this responsibility by failing to provide him with the requisite ADA paperwork and by failing to seek additional medical information from Smethurst or his doctor. Smethurst further argues that because it refused to engage in the interactive process, the City ultimately failed to provide him with a reasonable accommodation to his known disability in violation of the ADA. The City responds that it did not know Smethurst was requesting time off due to a disability, and that it therefore did not have an obligation to engage in the interactive process. It also argues that the accommodation Smethurst sought was unreasonable because he only informed the City of the length of time he would be absent from work, not the length of time of his impairment.

A.     Legal Standard for Reasonable-Accommodation Claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of a disability in regard to . . . the . . . discharge of employees . . . [or] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "[D]iscriminate against a qualified individual on the basis of a disability" is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such entity." *Id.* § 12112(b)(5)(A).

The Tenth Circuit has explained that in failure-to-accommodate cases, a plaintiff need not provide any evidence of discriminatory intent by the employer. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017). Rather, "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability'—the accommodations are only deemed reasonable (and,

thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is exigible." *Id.* (quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999)). Thus, to succeed on a claim for failure-to-accommodate under this provision of the ADA, an employee must show only that "(1) she is disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly reasonable accommodation" that was denied. *Id.* at 1050 (citation omitted). If a plaintiff makes this facial showing, "the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of [the] plaintiff's prima facie case or (2) establsishing an affirmative defense, such as undue hardship . . . ." *Id.* (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999)).

Relevant to this case, "[i]t is well-settled that a request for leave may lead to a 'reasonable' accommodation—such a request may allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future." *Punt*, 862 F.3d at 1051 (citation omitted). Requests for indefinite leave do not qualify as reasonable, however, and an employee seeking leave must "inform the employer of the '*expected duration of the impairment* (not the duration of the leave request).'" *Id.* (emphasis in original) (quoting *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Tr. v. Garrett*, 531 U.S. 536 (2001)). In short, an employer must be able to determine whether the employee "will be able to perform the essential functions of the job *in the near future* and therefore whether the leave request is a 'reasonable' accommodation." *Id.* (quoting *Cisneros*, 226 F.3d at 1130).

B.     Interactive Process

"Inherent in the statutory obligation to offer a reasonable accommodation" is the "obligation to engage in an interactive process." *Smith*, 180 F.3d at 1172. This process entails

"good-faith communications" by both the employer and employee in an effort to arrive at a reasonable accommodation *Id.* (citation omitted). "The exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated." *Id*. at 1073 (citation omitted). But the employer's responsibility to engage in the process is triggered when the employee makes an "adequate request, thereby putting the employer on notice." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). While the employee's request "'does not have to be in writing . . . or formally invoke the magic words "reasonable accommodation,"' it 'nonetheless must make clear that the employee wants assistance *for his or her disability*.'" *Id.* (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)).[5] In short, if a plaintiff shows that the defendant employer failed to engage in the interactive process, then he has met his burden under the third factor listed above.

    C.      Dispute Remains Whether the City Was on Notice

Turning to the three factors listed above, (1) that the plaintiff is disabled, (2) that the plaintiff is otherwise qualified, and (3) that the plaintiff requested a plausibly reasonable accommodation that was denied, Smethurst argues that the undisputed facts establish that he has

---

[5] While not binding on this court, the Seventh Circuit, when confronted with the issue of an ambiguous request for an accommodation, explained:

> Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification. In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark."

*E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 1996) (citation omitted).

satisfied all three and that he is therefore entitled to summary judgment on this claim. The City does not contest that Smethurst has satisfied the first two factors;[6] rather, it responds that he has failed to satisfy the third factor and that the City is therefore entitled to summary judgment. The City offers two arguments why the third factor is not satisfied: (1) that Smethurst himself failed to meaningfully engage in the interactive process, and (2) that Smethurst's requested accommodation was not reasonable. Accordingly, the City asserts that not only should this court deny summary judgment in favor of Smethurst, but also that it should grant summary judgment in favor of the City. The court considers each of these arguments in turn.

    1)  Smethurst's Participation in the Interactive Process

The City argues that because Smethurst did not himself engage in the interactive process, the City did not know that disability was the reason Smethurst sought more time off; therefore, its responsibility to engage in the interactive process was never triggered. The City claims that Smethurst never informed any of its employees the reason *why* he was seeking the additional time off—he only told them he wanted to use his paid time off at the conclusion of his FMLA leave. The City further argues that Smethurst failed to engage in the interactive process by withholding medical information that was accessible only to him.

---

[6] While the City does not dispute that Smethurst was disabled, as explained in more detail below, he received a release to return to work from his medical provider. While Smethurst argues that this was procured under duress, there may exist a dispute of material fact as to whether Smethurst was actually disabled at the time he requested further leave. But because the parties did not raise the issue of Smethurst's disability, the court declines to consider it. In addition, in response to some of Smethurst's other claims, the City argues that he was not qualified for his position because he lacked a valid CDL. But it did not raise this argument as to Smethurst's failure-to-accommodate claim; thus, the court declines to consider it at this stage.

Smethurst asserts that the City knew he had a disability and that it knew or should have known that he was requesting an accommodation under the ADA when he requested additional time off. Smethurst points out that Morris and Harper both reviewed Smethurst's medical certification when he initially requested FMLA leave in January 2017. The certification detailed Smethurst's mental health conditions, including major depression, anxiety, insomnia, and alcohol consumption, among others. The City admits that Harper reviewed this certification but disputes that Morris did. However, in his deposition, Morris said he "believe[d] that he received copies of the certification, and he admitted that he knew that Smethurst's "serious medical condition was related to his mental health." Morris Dep. (ECF No. 40-5) at 95:4–96:2. The City also does not dispute that Smethurst received short-term disability benefits during the twelve weeks he was on FMLA leave. It is therefore undisputed that the City was aware that Smethurst had a disability, at least for the duration of the time he spent on FMLA leave.

Thus, while it is undisputed that the City knew that Smethurst had a disability, the question remains whether the City knew that Smethurst was seeking an accommodation *for his disability* when he requested additional time off. *See C.R. England,* 644 F.3d at 1049. If it did, then it was obligated to engage in the interactive process (the City apparently concedes that it did not engage in the interactive process). *Id.* Smethurst asserts that he told Harper, Maiorano, and Morris through phone conversations that he was seeking additional time off specifically for the purpose of completing his therapy classes. It is undisputed that on April 10, 2017, Smethurst spoke on the phone with Harper and requested additional time off. While the City disputes that Smethurst mentioned anything about mental health or therapy classes, it is undisputed that Harper told Smethurst he could look into long-term disability benefits: Harper emailed Morris shortly after the call and informed him that she had told Smethurst he "could check into LTD if he has that benefit."

13

ECF No. 40-16 at 1. It is further undisputed that on April 12, 2017, the same day he received the notice of intent to separate from the City, Smethurst spoke on the phone with Maiorano. Smethurst again asserts that he told Maiorano he needed more time off in order to complete his therapy class, but the City disputes this assertion. Maiorano testified that Smethurst only asked for further time off, without specifying why. *See* Maiorano Dep. (ECF 40-2) at 71:7–72:8. Finally, Smethurst similarly testifies that he spoke on the phone with Morris and then Harper on April 19, 2017. He asserts that he told Morris he needed time off to finish his therapy class and that he asked Harper about long-term disability benefits. Harper and Morris deny recollection of the full substance of the calls, although Harper acknowledged via an email to Morris that Smethurst had inquired into long-term disability benefits.

The court concludes that a material dispute of fact remains as to whether Smethurst triggered the City's obligation to engage in the interactive process. As explained above, the parties dispute whether Smethurst ever informed anyone at the City of the precise reason he was requesting time off. Even assuming he did not, the City knew Smethurst had a disability and admits that he discussed long-term disability benefits with Harper during the same conversations in which he requested further time off. Based on these facts, a reasonable jury could find that Smethurst's request for time off triggered the City's duty to engage in the interactive process, even if he did not specifically inform anyone that his requested time off was to finish a class aimed at addressing his disability. Summary judgment for the City on this claim must therefore be denied.

Summary judgment for Smethurst is also unwarranted. Viewing the evidence in the light most favorable to the City, Smethurst never informed anyone at the City of the specific reason he was seeking time off. It could have been for some unrelated purpose, such as bereavement, vacation, the flu, or to obtain his CDL. A reasonable jury could therefore conclude that despite

knowing that Smethurst suffered from a disability, the City was unaware that his requested time off was specifically related to that disability. *See C.R. England,* 644 F.3d at 1049 (a request for an accommodation "must make clear that the employee wants assistance *for his or her disability*" (citation omitted)).[7] While it is well established that an employee need not use particular or formal language to make the request, the employer must, at a minimum, be able to ascertain from his words that he is seeking some accommodation due to a disability. Because there is a dispute of material fact whether Smethurst did so, a jury could conclude that the City was unaware that he was requesting an accommodation under the ADA, and that its duty to engage in the interactive process was therefore never triggered.[8]

> 2) Reasonableness of Smethurst's Requested Accommodation

The City also argues that summary judgment in its favor is warranted because even if Smethurst did participate in the interactive process, his request for time off was not "plausibly reasonable." This is because, the City argues, Smethurst only informed the City of the length of time he wished to remain off of work, not the expected duration of his impairment. *See Punt*, 862

---

[7] In his brief and to a greater extent at oral argument, counsel for Smethurst cited *Yinger v. Postal Presort, Inc.*, 693 Fed. App'x. 768 (10th Cir. 2017), for the proposition that the City's duty was triggered when he asked for leave because it knew that Smethurst was off work due to a medical condition. But in *Yinger*, it was undisputed that Yinger, the employee, told his employer that "his doctor anticipated Yinger would not be able to return to work until April 23 [an additional week]." *Id.* at 770. Thus, the employer in that case knew that it was Yinger's doctor who ordered the extra time off; it should have surmised that Yinger's request was related to a disability. In this case, it is disputed whether Smethurst told anyone at the City why he needed additional time off.

[8] The City also argues that Smethurst failed to engage in the interactive process by withholding medical information that was available only to him. But failure to provide medical information only constitutes failure to engage in the interactive process when the employer requests such information and the employee refuses to provide it. *See Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 618–19 (10th Cir. 1998). Here there is no indication that the City requested information that Smethurst was unwilling to provide.

F.3d at 1051. Smethurst responds that an employee is required to provide an expected duration of impairment only when it is unclear when the employee will be able to return to his or her duties. In this case, Smethurst told the City exactly when he would be able to return to work: May 15, 2017.

The City points to two Tenth Circuit cases, *Cisneros* and *Punt*, that explain that an employee must provide his employer with the expected duration of his impairment, not the duration of his leave from work. Both cases are distinguishable from the present one. In *Punt*, the employee, Kristin Punt ("Punt"), a receptionist who obtained her position through a temporary staffing agency, was undergoing tests related to a cancer diagnosis. 862 F.3d at 1044. She simply told the staffing agency, "After talking to my husband and doctor it is in my best interest not to come to work this week at all . . . . I hope to continue on [the following] Monday." *Id.* In further communications, Punt did not clarify when she would be able to return to work, but simply stated that it would be difficult given the amount of diagnostic testing she required. *Id.* at 1045. The Tenth Circuit panel found her request for time off to be an unreasonable accommodation because "she was very vague about how much time she . . . was going to miss." *Id.* at 1051 (omission in original). It reasoned that "[p]articularly for temporary employees, the ability to 'report to work consistently [is] a necessary part' of the job," so her vague requests for time off did not indicate that "she would be able to fill this necessary part of her job in the near future." *Id.* Likewise, in *Cisneros*, the employee provided two letters from her doctors, both of which stated that both the duration of her illness and the time she was required to be away from work were "uncertain" and "unknown." 226 F.3d at 1130. The plaintiff in that case conceded that there was "no firm date of return to work." *Id.*

16

In this case, by contrast, Smethurst informed Morris in a phone conversation on April 21, 2017 that he could return to work on May 15, only a month into the future.[9] Smethurst also informed Morris he would have his CDL by that date.[10] Based on these two facts, a reasonable jury could conclude that Morris provided the City with the expected duration of his impairment. The fact that Morris indicated he would return to work on that date, and that he would have his CDL, imply that he was able to fully return to his duties on May 15. Thus, a reasonable jury could find that Smethurst gave the City sufficient notice that he would "be able to perform the essential functions of the job *in the near future*." *Punt*, 862 F.3d at 1051 (emphasis in original) (quoting *Cisneros*, 226 F.3d at 1130). Summary judgment in favor of the City is therefore not warranted.

## II.   Discrimination in Violation of the ADA (Fifth Cause of Action)

The City argues that it is entitled to summary judgment on Smethurst's ADA discrimination claim because he failed to state a prima facie case of discrimination. The City further argues that even if Smethurst did establish a prima facie case, he cannot show that the City's proffered reason for terminating him is pretextual. To state a prima facie case for discrimination under the ADA, Smethurst must establish that

> (1) [ ]he is a disabled person as defined by the ADA; (2) [ ]he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) [his] employer discriminated against [him] because of [his] disability . . . . In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case. If a plaintiff establishes a prima facie case, the

---

[9] Smethurst contends that he informed Morris this would give him time to finish his therapy class, though the City disputes that Morris knew Smethurst requested that date specifically in order to give him time to complete the class.

[10] Smethurst, under increasing fear that he would lose his job, later informed Morris he could return to work immediately.

> burden shifts to the defendant to offer a legitimate
> nondiscriminatory reason for its employment decision. Should the
> defendant articulate a nondiscriminatory reason, the burden shifts
> back to plaintiff to show a genuine issue of material fact as to
> whether defendant's reason for the discharge is pretextual.

*MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005) (citations omitted),

*abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018). To show

pretext, Smethurst must establish "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the [City's] proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence . . . ." *Morgan v. Hilti, Inc.*,

108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted).

The City argues that Smethurst failed to raise a genuine issue of material fact as to the

second and third factors above, and that even if he did, he failed to show that the City's articulated

nondiscriminatory reason is pretextual. The court addresses each argument in turn.

A.  Smethurst's Qualification for the Position (Second Factor)

The City argues that Smethurst was unqualified for his position because he lacked a valid

CDL. As a result of his April 2016 DUI citation, Smethurst's CDL was invalidated. In the

reinstatement letter Briefer gave to Smethurst, dated July 29, 2016, Briefer wrote that Smethurst

would "be required to obtain a valid CDL within six months from the date of reinstatement, which

would be February 1, 201[7]." ECF No. 54-3 at 1. She further informed him that "[f]ailure to meet

this requirement, or any other minimum qualification for the Irrigation Operator II position, may

result in further disciplinary action, up to and including termination of employment." *Id.* It is

undisputed that Smethurst did not have a valid CDL at the time of his termination. The City argues

that due to this fact, Smethurst cannot establish that he was qualified for the position.

There exists a material dispute of fact as to whether a current CDL was a requirement for Smethurst's position. First, there is the language of the reinstatement letter itself. While it contemplated termination as a possible consequence of failing to obtain the CDL, it did not unequivocally state that Smethurst would be unqualified for his job if he did not obtain it—lesser disciplinary action was also possible. *Id.* (explaining that failure to obtain a valid CDL "*may* result in further disciplinary action, *up to* and including termination . . .") (emphasis added). Further, the City removed the CDL requirement for the Irrigation Operator position after it terminated Smethurst. *See* Maiorano Dep. (ECF No. 40-2) 16:18–17:3. And Smethurst's eventual replacement, Matt McKee, who was hired approximately a year after Smethurst's termination, did not have a CDL. Finally, Smethurst informed the City that he could obtain a valid CDL by May 10, 2017. If a jury were to conclude that Smethurst's request for an ADA accommodation was reasonable, as the court explained above, then Smethurst would have had at least until May 15, 2017 to obtain a new CDL, since he would not have been required to return to work until that date. Based on these facts, a reasonable jury could conclude that Smethurst's lack of a valid CDL did not make him unqualified to "perform the essential functions of [his] job." *MacKenzie*, 414 F.3d at 1274.

B.  Discrimination Because of Disability (Third Factor)

The City also argues that Smethurst cannot raise a genuine dispute of material fact as to the third factor—that the City terminated him because of his disability.  It argues:

> As for the third element, Smethurst lacks evidence that suggest the City discriminated against him "because of" a disability. Indeed, the undisputed facts demonstrate that Smethurst: i) knew his full allotment of FMLA leave expired on April 14, 2017 and that any unprotected absences from work after that date could jeopardize his employment with the City; ii) received and reviewed the <u>Notice of Intent</u> on April 12, 2017 (sixteen days before he was ultimately

19

> separated); and iii) was aware that, if he did not return to work upon
> the expiration of his FMLA leave <u>and</u> failed to avail himself of any
> of the four options listed in the <u>Notice of Intent</u>, his employment
> with the City would end on April 24, 2017.

ECF No. 54 at 25 (citations omitted) (emphases in original). Thus, the City apparently argues

that it fired Smethurst not because of his disability, but because he failed to return to work.

Again, material disputes of fact preclude summary judgment on this claim. While

Smethurst told Morris on April 24, 2017 that he could return to work immediately—only after

having his repeated requests for extra leave denied and after having received the Notice of Intent

to Separate from the City—the City points to no evidence in the record that it ever instructed

Smethurst to return to work or even presented him with that option. Rather, during the April 24th

phone call, Morris informed Smethurst he would let Briefer know that Smethurst was available to

return to work and then get back to Smethurst.[11] When Smethurst did not hear back from Morris,

he called him again, on April 26th, and left messages inquiring about arrangements for him to

return to work. But Morris never got back to Smethurst, and instead served him with a termination

letter on April 28th. Moreover, the City never provided Smethurst with a "return-to-work" form, a

document it normally sends to employees with expiring FMLA leave before they may return to

work. Morris Dep. (ECF No. 40-5) 168:13–23. Although the City faults Smethurst for failing to

return to work, facts in the record suggest that the City never instructed him to return to work,

never got back to him about when he could return, and never sent him the paperwork City

employees normally receive prior to returning to work after FMLA leave.  Based on these facts, a

---

[11] Morris did inform Briefer that Smethurst could return to work immediately. *See* ECF No. 40-25
at 1.

reasonable jury could find that Smethurst made a good faith effort to return to his position at the conclusion of his FMLA leave, and that the City prevented him from doing so.

Additionally, the timing of the Notice of Intent to Separate supports an inference of a causal nexus between Smethurst's disability and his termination. Morris drafted the Notice of Intent to Separate and sent it to Smethurst on April 12, 2017, only two days after Smethurst's phone conversation with Harper in which he alleges he requested time off to finish his therapy class and thereby put her on notice that he was seeking an accommodation for an ongoing disability.[12] If a jury finds that Smethurst put the City on notice of his continuing disability during the April 10th phone call with Smethurst, then the close temporal proximity of the phone call and the Notice of Intent to Separate supports an inference of discrimination. The Tenth Circuit has explained that in the ADA discrimination context, "[t]he temporal proximity of Plaintiff's request for an accommodation to the decline in his work evaluations and his supervisors' complaints about his work performance contributes to an inference that Plaintiff's position was eliminated because of his disability." *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 749 (10th Cir. 1999) (citation omitted). The Notice of Intent to Separate in this case is analogous to the decline in work evaluation and supervisor complaints in *Butler.* Thus, based on the close temporal proximity of these events, the court concludes that Smethurst has established a prima facie case of discrimination under the ADA.

C.  Non-Discriminatory Reasons for Termination

Because Smethurst has established a prima facie case of discrimination, the burden shifts to the City to offer a legitimate non-discriminatory reason for terminating Smethurst. The City

---

[12] The City disputes that Smethurst told Harper why he was seeking time off.

argues that it had "multiple legitimate non-discriminatory reasons for ending Smethurst's employment, namely his failure to return to work upon the expiration of his FMLA leave (or to avail himself of any of the four options listed in the Notice of Intent) and his lack of a valid CDL." ECF No. 54 at 26–27. But material disputes of fact preclude summary judgment on this issue. First, as explained in the previous subsection, a reasonable jury could find that Smethurst's "failure" to return to work was caused by the City. It could find that Smethurst made a good faith effort to return and the City prevented him from doing so. Second, the Notice of Intent to Separate made no mention of Smethurst's lack of a CDL; it purported to end his employment due to his medical needs and inability to return to work. And the City fails to point to anything in the record indicating that this was one of the reasons Smethurst was terminated. In short, the City has not met its burden to show by undisputed facts that it had a legitimate, nondiscriminatory reason for terminating Smethurst.[13]

## III.    FMLA Interference (Second Cause of Action)

The City also moves for summary judgment on Smethurst's FMLA interference claim. Smethurst alleges that the City failed to reinstate Smethurst to his previous position at the conclusion of his FMLA leave in violation of 29 U.S.C. § 2614(a). To succeed on a claim under

---

[13] While not dispositive of this issue, at the EAB hearing in this matter, the City conceded that it did not terminate Smethurst due to his lack of CDL and indicated that it would not make such an argument. *See* EAB Hearing Transcript (ECF No. 53-1) 93:1–18. ("[T]he city agrees with [counsel for Smethurst] in the sense that the city is not arguing that Mr. Smethurst was separated from employment for failure to have a CDL. The city has no intent of putting on any evidence even remotely stressing to that possibility . . . . The only question the city would like to get on there for the record is that he did not have a CDL at the time that these events were occurring. That's the only question the city intends to ask. The city is not using that to in any way suggest that the lack of a CDL was any part of the basis for the separation.").

this provision, Smethurst "must establish (1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005) (citation omitted). To satisfy the second element, Smethurst must show that "[ ]he was prevented from taking the full 12 weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave." *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007) (citation omitted). If Smethurst meets his burden to show that the first two elements are satisfied, then the burden shifts to the City to show that the third element is not satisfied—it must show that its action was not related to the exercise of Smethurst's FMLA rights. *Id.* (citation omitted).

Here, the City argues that Smethurst cannot satisfy the second element, and even if he could, the third element is not satisfied. The court addresses each in turn.

A. Interference with FMLA Right (Second Element)

Smethurst asserts that the second element is satisfied because the City failed to restore Smethurst to his former position at the conclusion of his FMLA leave. The City argues that it did not fail to reinstate Smethurst to his former position; rather, it contends that Smethurst simply failed to present the City with a medical release or valid CDL, prerequisites to his reinstatement. It also argues that he "chose not to contact Brown, Maiorano, Briefer, or anyone else at the City to inform them of his ability to immediately return to work." ECF No. 54 at 29. Smethurst responds that he made a "responsible and concerted effort" to return to his job after his FMLA leave was up, and the City rebuffed his efforts and prevented him from returning to his position.

Again, material disputes of fact preclude summary judgment for the City on this element. As explained above, Smethurst maintains that he *did* inform the City he could return to work

23

immediately—on April 24, 2017 Smethurst told Morris he could return to work immediately. Morris relayed this information to Briefer, just as he told Smethurst he would. *See* ECF No. 40-25 at 1. It is unclear why Smethurst would also be required to call Brown, Maiorano, or Briefer to inform them he could return to work when he had already told Morris. In addition, Smethurst testified that the reason he never submitted his medical release or reported for work was that he was waiting to hear back from Morris. Thus, as explained in Subsection II.B, a reasonable jury could find that Smethurst made a good faith effort to return to his position at the conclusion of his FMLA leave and was denied the chance by the City.

B.  Relation of Employer's Action to FMLA Right (Third Element)

The City next argues that Smethurst's termination was not related to Smethurst's exercise of an FMLA right. It makes two arguments: (1) Smethurst did not exercise his right to return to work because he failed to show up for work; and (2) because Smethurst did not have a valid CDL as of April 28, his dismissal would have occurred regardless of his FMLA leave.

But as explained previously, a reasonable jury could find that Smethurst did exercise his right to return to work by making a concerted effort to do so, both by requesting a temporary extension of his leave and by informing Morris, who in turn informed Briefer, that he could return to work immediately. Second, as explained in Subsection II.C, the City never purported to terminate Smethurst for lack of a valid CDL. Thus, while Smethurst could have faced some disciplinary action for failing to obtain a valid CDL, a jury may conclude that fact alone is not enough to satisfy the City's burden to show that its termination of Smethurst was not related to his exercise of rights under the FMLA.

IV.     **Breach of Implied Contract (Third Cause of Action)**

Smethurst also asserts a cause of action for breach of implied contract. The City moves for summary judgment on this claim. Smethurst points to the City's HR policy manual, which states:

> An employee may be separated from employment on the basis of unavailability when an employee is unable to return to their position after all approved leave has been exhausted and there is no reasonable alternative available that would allow the employee to return to their position and perform the functions of their job.

ECF No. 40-31 at 1. Smethurst argues that this provision was part of an implied contract between himself and the City, and that there are questions of material fact as to whether the City breached it. Specifically, Smethurst asserts that there are questions of fact as to whether he was "unavailable" and whether there was a "reasonable alternative available." The City argues that no contract, implied or otherwise, existed between the parties. It points to the disclaimer at the beginning of the HR policy, which states, "The City's policies, procedures, and practices do not create any contractual rights, either express or implied, or any other obligation or liability on the City." ECF No. 76-2 at 1.[14]

The Court agrees with the City. It is true that "[a]n implied contract may arise from a variety of sources including personnel policies, or provisions of an employment manual." *Cabaness v. Thomas*, 232 P.3d 486, 502 (Utah 2010), *abrogated on other grounds by Gregory & Swap, PLLC v. Kranendonk*, 424 P.3d 897 (Utah 2010). However, the Utah Supreme Court has held that "a clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material

---

[14] Smethurst initially argued that the policy manual did not contain this disclaimer at the time of his termination and that it was only added later. This was in part because the City attached the disclaimer as evidence without an accompanying affidavit or other evidence to authenticate it. The court granted the City leave to submit additional evidence to authenticate the disclaimer, and the City did so. *See* ECF Nos. 76, 76-1–7. Smethurst no longer disputes that the disclaimer is authentic.

from being considered as implied-in-fact contract terms." *Id.* at 503 (quoting *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991)). Here, the language in the provision cited by the City clearly disclaims contractual liability.[15] The court therefore grants summary judgment in favor of the City on this claim.

---

[15] At oral argument, Smethurst argued for the first time that the disclaimer is ambiguous because it is unclear whether the City disclaims contractual liability specifically with respect to its employees. Even if the court were to consider this argument, it would fail. The plain language of the disclaimer clearly disclaims any and all contractual liability. The Utah Supreme Court found very similar language sufficient to prevent a company's employee manual from creating contractual obligations with its employee. *See Johnson*, 818 P.2d at 1003 (finding the following language sufficient to disclaim contractual liability to employee: "The policies and procedures expressed in this book, as well as those in any other personnel materials which may be issued from time to time, do not create a binding contract or any other obligation or liability on the company.").

## CONCLUSION AND ORDER

The court HEREBY ORDERS as follows:

1.  The parties' cross-motions for summary judgment on Smethurst's failure-to-accommodate claim (Fourth Cause of Action) are DENIED.

2.  The City's motion for summary judgment on Smethurst's ADA discrimination claim (Fifth Cause of Action) is DENIED.

3.  The City's motion for summary judgment on Smethurst's FMLA claim (Second Cause of Action) is DENIED

4.  The City's motion for summary judgment on Smethurst's breach of implied contract claim (Third Cause of Action) is GRANTED.

Pursuant to this Order and because the court previously dismissed Count I of the Amended Complaint, only Smethurst's Second, Fourth, and Fifth Causes of Action remain pending in this matter.

DATED March 30, 2021.

BY THE COURT

Jill N. Parrish
United States District Court Judge